UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
HAZAN SPORTS MANAGEMENT GROUP, :
INC.,                          :
                               :          25 Civ. 3259 (JAV) (GS)
               Plaintiff,      :
                               :          REPORT &
     - against -               :          RECOMMENDATION
                               :
MALIK BEASLEY,                 :
                               :
               Defendant.      :
-------------------------------------------------------------X

**GARY STEIN, United States Magistrate Judge:**

Plaintiff Hazan Sports Management Group, Inc. ("HSM" or "Plaintiff")

asserts a claim for breach of contract against Defendant Malik Beasley ("Beasley" or

"Defendant").  Plaintiff now moves under Rule 55 of the Federal Rules of Civil

Procedure for a default judgment against Beasley due to his failure to appear in this

action.  (Dkt. Nos. 23, 36).

For the reasons set forth below, the undersigned respectfully recommends

that Defendant be found liable for breach of contract and that Plaintiff be awarded

$1,000,000 in damages plus pre-judgment and post-judgment interest.

## BACKGROUND

### A.  Relevant Facts

Plaintiff HSM is a boutique professional basketball agency based in New

York.  (Dkt. No. 1, Complaint ("Compl.") ¶¶ 1, 8; Dkt. No. 38, Amended Declaration

of Daniel Hazan ("Hazan Decl.") ¶ 4).  Defendant Beasley is a former Detroit

1

Pistons shooting guard and a resident of Michigan.  (Compl. ¶¶ 1, 9; Hazan Decl. ¶ 3).

On or about November 27, 2023, Beasley formally became HSM's client by entering into two separate contracts with HSM: a Standard Player Agent Contract ("SPAC")—which governed the relationship between HSM and Beasley with respect to his on-court activities—and a separate Player Marketing Agreement (Hazan Decl. Ex. A ("Marketing Agreement" or "Agreement")), which appointed HSM as Beasley's exclusive marketing agent for a term of four years.  (Compl. ¶¶ 1-2, 10; Hazan Decl. ¶¶ 5-6).  It is the Marketing Agreement that forms the basis for HSM's claim of breach of contract in this action.  (*See* Compl. ¶¶ 20-23).

The Marketing Agreement contains the following relevant provisions:

- [Beasley] hereby appoints [HSM] as [Beasley]'s sole and exclusive representative for the marketing or representation for any use of his attributes, including, but not limited to, his name, image, likeness, signature, voice, character and for personal appearances (collectively "Rights of Publicity") throughout the world. . . . [HSM] shall be the *sole* and *exclusive* party authorized to develop, negotiate, organize and administer any and all income-producing activities available to [Beasley] for use of his Rights of Publicity, including but not limited, to licensing, endorsements, personal appearances, television, film, modeling and fashion, literary and musical activities, special events, multi-media and social media (hereinafter "Marketing Activities").

(Marketing Agreement § 1(a) ("Exclusivity Provision") (emphasis in original)).

- [HSM] agrees to pay a one-time Marketing Advance in the amount of $650,00 . . . directly to [Beasley] . . . In consideration for the Marketing Advance, [Beasley] agrees that [HSM] shall be entitled to 100% of all Gross Earnings generated with respect to the Agreement until it has recouped the full amount of the Marketing Advance.

(*Id.* § 2 ("Marketing Advance Provision")).

- Notwithstanding the foregoing, [Beasley] acknowledges and accepts that if this Agreement is terminated for any reason (a "Termination Event") [Beasley] shall be required to pay [HSM] liquidated damages in the amount of $1,000,000 (one million USD) (the "Liquidated Damages Amount") along with any marketing fees due and payable under this Agreement to [HSM] within thirty (30) days of such Termination Event without reduction for any taxes withheld by [HSM] upon its payment to [Beasley] of the Marketing Advance. The Parties agree that the Liquidated Damages Amount is fair and acceptable in light of the amount of the Marketing Advance and the risk assumed by [HSM] with respect to the Marketing Advance.

(*Id.* § 2 ("Liquidated Damages Provision")).

- All expenses incurred by [HSM] toward the execution of any Marketing Activities or in general service of, to, or on behalf of [Beasley] shall be deemed to be an additional advance by [HSM] and shall be recoverable by [HSM] if this Agreement is terminated for any reason ("Expenses"). Nonetheless, if this Agreement is terminated for any reason prior to the negotiation by [HSM] of any contract for [Beasley] that allows [HSM] to recoup the Marketing Advance and Expenses identified herein, the Expenses incurred by [HSM] shall be added to the Liquidated Damages Amount.

(*Id.* § 4 ("Expenses Provision")).

- As compensation for the above services, [HSM] shall be paid a percentage of all amounts (the "Commission") received by or payable to or for the benefit of [Beasley] or any entity controlled by [Beasley], reduced only by the Expenses otherwise payable to [HSM] hereunder (the "Gross Earnings") from contracts, engagements, and/or any other transactions entered into during the [term] of this Agreement . . . for all Marketing Activities[.] . . . The Commission shall be twenty percent (20%) of Gross [E]arnings[.]

(*Id.* § 3 ("Commission Provision")).

- The initial term of this Agreement shall be for a period of four (4) years commencing upon November 27, 2023. . . . In the event that [HSM] has not fully recouped the Marketing Advance prior to the effective date of Termination of this Agreement, [Beasley] shall be required to remit the Liquidated Damages Amount as well as any Expenses incurred by [HSM] with respect to this Agreement to [HSM][.]

(*Id.* § 5 ("Termination Provision")).

Pursuant to the Marketing Agreement, HSM provided Beasley with the $650,000 Marketing Advance required under Section 2. (Compl. ¶ 11; Hazan Decl. ¶ 7). The Marketing Advance was paid through payments of nearly $300,000 around the time the Agreement was executed followed by a series of smaller payments continuing through November 2024. (Hazan Decl. Ex. B).

In addition to the Marketing Advance, HSM incurred additional expenditures on behalf of Beasley while serving as his marketing agent. (Hazan Decl. ¶ 8[1][1]). These expenses, described as being "in general support of Beasley's playing career, including training expenses, various preexisting financial obligations, etc.," total $193,774.64. (*Id.* ¶ 8[1] & Ex. B). Such expenses are defined as "Expenses" under the Expenses Provision and deemed to be an additional advance recoverable by HSM. (Marketing Agreement § 4).

Both on and off the court, HSM "diligently represented" Beasley's interests pursuant to the Marketing Agreement and the SPAC. (Compl. ¶ 16; Hazan Decl. ¶ 8[2]). HSAM secured a one-year contract for Beasley to play for the Detroit Pistons during the 2024-25 season worth $6 million, more than double Beasley's salary during the preceding season. (Compl. ¶ 14; Hazan Decl. ¶ 8[2]).

Despite HSM's good faith efforts to represent Beasley, Beasley breached the Exclusivity Provision of the Marketing Agreement by engaging Brian Jungreis and

---

[1] Hazan's Amended Declaration mistakenly contains two paragraphs enumerated as the eighth paragraph. The Court differentiates the two by citing the first as "¶ 8[1]]" and the second as "¶ 8[2]."

Seros Partners to serve as his marketing agent.  (Compl. ¶¶ 14-17; Hazan Decl. ¶ 9).[2]  On February 25, 2025, Beasley sent an email to HSM explicitly terminating the SPAC and "any and all other representation, contracts of any kind that may currently be in effect between [Beasley and HSM]."  (Dkt. No. 42, Transcript of Proceedings, Nov. 18, 2025 ("Tr."), at 7:9-9:24).

In the ensuing weeks after Beasley's termination, HSM made several attempts to collect the Marketing Advance and settle the matter, but when those efforts failed, it filed this action.  (Compl. ¶¶ 18-19; Hazan Decl. ¶ 16).  The Complaint asserts three separate claims for relief under the Marketing Agreement: (1) breach of contract ("First Claim for Relief") (Compl. ¶¶ 20-23); (2) liquidated damages, a claim asserted in the alternative to the First Claim for Relief ("Second Claim for Relief") (*id.* ¶¶ 24-26); and (3) attorney's fees incurred as a result of Beasley's alleged breach ("Third Claim for Relief") (*id.* ¶¶ 27-30).  HSM's *ad damnum* clause seeks (1) damages on the First Claim for Relief in an amount believed to exceed $1 million; (2) liquidated damages on the Second Claim for Relief in the sum of $1 million, together with statutory interest and any earned and unpaid marketing fees; and (3) damages on the Third Claim for Relief in an amount believed to exceed $250,000.  (Compl. at 6).

---

[2] HSM alleges that Beasley also engaged Brian Jungreis and Seros Partners to serve as his on court agent as well, but this does not serve as the basis for HSM's breach of contract claim.  (*See* Compl. ¶ 17 (alleging only that Beasley's engagement of Jungreis and Seros Partners as his marketing agent represents a violation of the Exclusivity Provision of the Marketing Agreement)).

5

## B. Procedural History

Plaintiff commenced this action on April 20, 2025.  (Dkt. No. 1).  Beasley was personally served with the Summons and Complaint on April 21, 2025 at the Ritz Carlton Nomad hotel in Manhattan.  (Dkt. No. 10).  Beasley failed to file an answer or other response to the Complaint when due on May 12, 2025.  (Dkt. No. 12).

As a result, on August 6, 2025, HSM applied for a Clerk's Certificate of Default against Beasley.  (Dkt. Nos. 18, 19).  Following the Clerk of Court's issuance of a Certificate of Default on August 13, 2025 (Dkt No. 21), HSM filed a motion for default judgment on August 18, 2025, requesting an award of $1,325,000 along with statutory nine percent (9%) interest from February 25, 2025 (Dkt. No. 23); a memorandum of law in support of the motion (Dkt. No. 26 ("Pl. Br.")); declarations from its counsel, Daniel Marcus (Dkt. No. 24), and its founder and president, Daniel Hazan (Dkt. No. 25); and a proposed order of default judgment (Dkt. No. 27). HSM's requested damages award included three components: (1) liquidated damages of $1 million; (2) additional expenses of $250,000 incurred by HSM in addition to the Marketing Advance; and (3) attorneys' fees of $75,000.  (Pl. Br. at 14, 16; Dkt. No. 25 ¶¶ 13-16).

On August 20, 2025, the Honorable Jeannette A. Vargas issued an Order scheduling a Default Judgment and Show Cause hearing, and providing Beasley the opportunity to submit a brief in opposition to HSM's motion by no later than September 17, 2025.  (Dkt. No. 28).  On September 15, 2025, Judge Vargas referred

the matter to the undersigned for a report and recommendation on HSM's motion for a default judgment and an inquest on damages. (Dkt. No. 32).

This Court held a hearing on HSM's motion, attended solely by HSM's counsel, on November 18, 2025. (*See* Minute Entry dated Nov. 18, 2025). Beasley filed no opposition and failed to appear at the hearing. (*See* Tr. 4:7-16).

Based on questions asked by the Court during the hearing, HSM filed an amended motion for default judgment on December 2, 2025 (Dkt. No. 36), together with amended declarations from its counsel (Dkt. No. 39) and Daniel Hazan (Dkt. No. 38 (*i.e.*, Hazan Decl.)), as well as an amended proposed default judgement (Dkt. No. 37). The amended motion lowers HSM's damages request to $1,193,774.64 (together with statutory interest from February 25, 2025) which HSM explains reflects a more accurate computation of the additional expenses it incurred. (*See* Dkt. No. 36-2; Hazan Decl. ¶¶ 8, 14). The amended motion drops HSM's request for attorney's fees altogether. (*See* Dkt. No 36-2).

On December 5, 2025, the Court ordered that Beasley file any opposition to the amended motion by no later than December 23, 2025. (Dkt. No. 40). Beasley filed no such opposition and has failed to appear in this action as of the date of this Report and Recommendation.

## LEGAL STANDARDS

### A. Entry of Default

A party seeking a default judgment must follow the two-step procedure set forth in Federal Rule of Civil Procedure 55. *Burns v. Scott*, 635 F. Supp. 3d 258, 271

(S.D.N.Y. 2022). First, the Clerk of the Court must enter a Certificate of Default under Rule 55(a). *Id.* Second, if the defaulting party still fails to appear or move to set aside the default, the Court may enter a default judgment under Rule 55(b). *Id.* "Whether to enter a default judgment lies in the 'sound discretion' of the trial court." *Id.* (quoting *Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 95 (2d Cir. 1993)).

"On a motion for default judgment after default has entered, 'a court is required to accept all of the [plaintiff's] factual allegations as true and draw all reasonable inferences in [the plaintiff's] favor, but it is also required to determine whether the [plaintiff's] allegations establish [the defendant's] liability as a matter of law.'" *Mirlis v. Greer*, 80 F.4th 377, 383 (2d Cir. 2023) (quoting *Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009)). "A district court retains discretion [on default] to require proof of necessary facts, and need not agree that the alleged facts constitute a valid cause of action." *Galeana v. Lemongrass on Broadway Corp.*, 120 F. Supp. 3d 306, 313 (S.D.N.Y. 2014) (quoting *Finkel*, 577 F.3d at 84) (cleaned up). The court may rely on the relevant factual allegations found in the complaint and any additional affidavits filed by the plaintiff. *Id.*

In determining whether to grant a default judgment, the court considers "(1) whether the defendant's default was willful; (2) whether [the] defendant has a meritorious defense to plaintiff's claims; and (3) the level of prejudice the non-defaulting party would suffer as a result of the denial of the motion for default judgment." *Pires v. UOB Hldgs. (USA) Inc.*, No. 20 Civ. 01612 (LTS) (GWG), 2022 WL 902464, at *2 (S.D.N.Y. Mar. 28, 2022) (citation omitted). When a party does

8

willfully default, the court is "not required 'to raise *sua sponte* affirmative defenses, which may, of course, be waived or forfeited, on behalf of an appearing party who elects not to pursue those defenses for itself.'" *b.I.G.f.a.c.e. Ent. Inc. v. Young Money Ent., LLC*, No. 15 Civ. 5878 (LTS), 2016 WL 5092598, at *2 (S.D.N.Y. Sept. 19, 2016) (citation omitted).

### B. Damages on Default

Unlike a finding of liability on a default motion, a district court "need not—and indeed cannot—rely on the plaintiff's unsupported allegations to establish its damages." *GlobeRunners Inc. v. Env't Packaging Techs. Holdings, Inc.*, No. 18 Civ. 4939 (JGK) (BCM), 2020 WL 1865536, at *3 (S.D.N.Y. Mar. 6, 2020) (citing *Greyhound Exhibitgroup v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992)), *R&R adopted*, 2020 WL 1862565 (S.D.N.Y. Apr. 14, 2020). Instead, the Court must find "an evidentiary basis for the damages sought by plaintiff, and [the] court may determine there is sufficient evidence either based upon evidence presented at a hearing or upon a review of detailed affidavits and documentary evidence." *Cement & Concrete Workers Dist. Council Welfare Fund, Pension Fund, Annuity Fund, Educ. & Training Fund & Other Funds v. Metro Found. Contractors Inc.*, 699 F.3d 230, 234 (2d Cir. 2012). The plaintiff's damages calculation "must not differ in kind from, or exceed in amount, what is demanded in the pleadings." Fed. R. Civ. P. 54(c).

Under Fed. R. Civ. P. 55(b), a hearing on damages is not obligatory. *See* Fed. R. Civ. P. 55(b)(2); *Fustok v. ContiCommodity Servs. Inc.*, 873 F.2d 38, 40 (2d Cir. 1989) ("By its terms, 55(b)(2) leaves the decision of whether a hearing is necessary to the discretion of the district court."). "The Second Circuit has upheld damages determinations made on the basis of affidavits and other documentary evidence without a hearing 'as long as the Court is ensured that there was a basis for the damages specified in the default judgment.'" *Jamieson as Trustee for Raymond David Jamieson Irrevocable Grandchildrens Trust v. Sec. America*, No. 19 Civ. 1817 (VB)(JCM), 2022 WL 20399724, at *3 (S.D.N.Y. Feb. 22, 2022) (quoting *Chen v. Jenna Lane, Inc.*, 30 F. Supp. 2d 622, 624 (S.D.N.Y. 1998)), *R&R adopted*, 2022 WL 1304590 (S.D.N.Y. May 2, 2022). Here, neither party requested an evidentiary hearing on damages, and the Court determined that such a hearing was unnecessary.

## DISCUSSION

After first confirming that it has subject matter jurisdiction over this case and personal jurisdiction over Beasley, the Court finds that Beasley is liable to HSM for breach of contract and then assesses the damages and other relief to which HSM is entitled based on that breach.

### A. Jurisdiction

Subject matter jurisdiction exists under 28 U.S.C. § 1332(a)(1), as there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000. (Compl. ¶ 6).

In this Circuit, when defendants fail to appear in civil suits, district courts may *sua sponte* review whether they have personal jurisdiction over the non-appearing defendant.  *See Sinoying Logistics Pte Ltd. v. Yi Dan Xin Trading Corp.*, 619 F.3d 207, 213 (2d Cir. 2010) ("Because personal jurisdiction can be waived by a party, a district court should *not* raise personal jurisdiction *sua sponte* when a defendant has appeared and consented . . .  to the jurisdiction of the Court. But when a Defendant declines to appear . . . before a court grants a motion for default judgment, it may first assure itself that is has personal jurisdiction over the defendant.") (cleaned up).[3]

Personal jurisdiction exists here for two reasons.  First, Beasley was served while he was in this District, apparently for a playoff game between the Pistons and the New York Knicks.  (Pl. Br. at 6; Dkt. No. 10).  Under longstanding principles of "tag" jurisdiction, service of process on an individual who is within the forum, even transiently, is a recognized basis for personal jurisdiction under New York law and comports with due process.  *See Burnham v. Sup. Ct. of Cal.*, 495 U.S. 604 (1990); *Loughlin v. Good*, 558 F. Supp. 3d 126, 139-42 (S.D.N.Y. 2021).

Second, the Marketing Agreement contains a choice of forum clause, which provides: "Any and all disputes arising out of this Agreement shall be adjudicated by a New York state court of competent jurisdiction located in New York County or a federal court located in New York County, New York."  (Marketing Agreement §

---

[3] In contrast, the Court need not conduct a *sua sponte* venue analysis because a non-appearing defendant waives its right to challenge venue by failing to appear.  *See Alonso v. New Day Top Trading, Inc.*, No. 18 Civ. 4745 (PAE) (DCF), 2021 WL 4691320, at *1 n.3 (S.D.N.Y. Oct. 7, 2021).

16). It is well settled that "[p]arties can consent to personal jurisdiction through forum-selection clauses in contractual agreements." *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 103 (2d Cir. 2006). The forum selection clause here is *prima facie* valid and enforceable and unquestionably covers HSM's action for breach of the Marketing Agreement. Accordingly, it supplies an independent basis for exercising personal jurisdiction over Beasley. *See, e.g.*, *LG Cap. Funding, LLC v. E-Waste Sys., Inc.*, No. 20 Civ. 4474 (PGG) (BCM), 2021 WL 9036280, at *4-5 (S.D.N.Y. Dec. 10, 2021) (finding that a defaulting defendant consented to personal jurisdiction in New York via a forum selection clause).

## B. Liability

Turning to the issue of liability, the Court notes that, since Beasley has never appeared in this action, answered the Complaint, or responded to the motion for default judgment, (1) Beasley's default is willful, (2) Beasley has not presented any meritorious defense to HSM's claims, and (3) HSM would be prejudiced if denied judgment by default. These factors thus all weigh in HSM's favor. *See Pires*, 2022 WL 902464, at *2.

The Court still must independently analyze whether HSM's factual allegations, taken as true, establish Beasley's liability for breach of contract. Because the Marketing Agreement contains a New York choice-of-law clause (*see* Marketing Agreement § 16), the Court applies New York law in analyzing Beasley's liability. *See, e.g., Mindspirit, LLC v. Evalueserve Ltd.*, 346 F. Supp. 3d 552, 583 (S.D.N.Y. 2018) ("[A] New York choice-of-law clause in a contract . . . demonstrates

12

the parties' intent that courts not conduct a conflict of laws analysis." (citation omitted)).

Under New York law, "the elements of a claim for breach of contract are: '[1] the existence of a contract, [2] the plaintiff's performance thereunder, [3] the defendant's breach thereof, and [4] resulting damages.'" *Alpha Cap. Anstalt v. Real Goods Solar, Inc.*, 311 F. Supp. 3d 623, 628 (S.D.N.Y. 2018) (quoting *Harris v. Seward Park Hous. Corp.*, 79 A.D.3d 425, 426, 913 N.Y.S.2d 161 (1st Dep't 2010)); *see Terwilliger v. Terwilliger*, 206 F.3d 240, 246 (2d Cir. 2000).

HSM has "proven each element of the breach of contract claim with respect to" the Marketing Agreement. *Interglobo Customs Broker Inc. v. Sunderland Bros. Co.*, No. 19 Civ. 5723 (GBD) (JLC), 2019 WL 5996281, at *5 (S.D.N.Y. Nov. 14, 2019). First, HSM has provided a duly executed copy of the Marketing Agreement signed by both Beasley and Daniel Hazan on behalf of HSM. (Hazan Decl. Ex. A). The Marketing Agreement contains clear and definite promises, *inter alia*, for HSM to serve as Beasley's exclusive marketing agent and provide Beasley with the Marketing Advance, and for Beasley, in exchange, to provide HSM with commissions from commercial exploitation of his Rights of Publicity. (*See* Marketing Agreement §§ 1-3). A valid and enforceable contract thus exists.

Second, HSM has established that it performed its part of the bargain by, *inter alia*, funding the Marketing Advance and "dutifully and diligently" representing Beasley's interests as his marketing agent. (Compl. ¶¶ 11, 16; Hazan Decl. ¶ 6, 8[2]).

13

Third, HSM has established the element of breach by alleging that Beasley engaged Brian Jungreis and Seros Partners to serve as his marketing agent and terminated the Marketing Agreement in February 2025.  (Compl. ¶ 17; Hazan Decl. ¶ 9; Tr. 7-9:9-24).  This was a clear violation of the Exclusivity Provision, pursuant to which Beasley appointed HSM as his "sole and exclusive representative" for marketing beginning on November 27, 2023 and continuing until at least the expiration of the contract's initial four-year term.  (Marketing Agreement §§ 1(a), 5).

Fourth, and as discussed more fully below, HSM has alleged and established damages resulting from Beasley's breach.  (Compl. ¶¶ 23-26; Hazan Decl. ¶¶ 7-8, 13).

As each element of the claim has been established, the Court recommends that Beasley be found liable for breach of contract.

## C.  Damages

The Court now turns to the question of the damages to be awarded for Bealey's breach of contract.  HSM seeks damages in the amount of $1,193,774.64 and interest thereon (Dkt. No. 36)—a sum derived from the $1 million Liquidated Damages Amount specified in the Marketing Agreement, plus $193,744.64 for Expenses incurred on Beasley's behalf in addition to the Marketing Advance.  (Hazan Decl. ¶¶ 13, 17).  HSM seeks recovery of both amounts as liquidated

damages pursuant to the Liquidated Damages Provision of the Marketing

Agreement (Section 2).  (*Id.*).[4]

### 1.  Request for $1 Million in Liquidated Damages

The Court begins by addressing HSM's request for the $1 million amount

specified in the Liquidated Damages Provision.  This component of HSM's damages

claim is readily established by the evidence before the Court.

Under the Liquidated Damages Provision, Beasley agreed (in relevant part)

that "if this Agreement is terminated for any reason (a 'Termination Event') [he]

shall be required to pay [HSM] liquidated damages in the amount of $1,000,000 . . .

within thirty (30) days of such Termination Event. . . ."  (Marketing Agreement § 2).

Beasley's engagement of Brian Jungreis and Seros Partners, followed by his

February 25, 2025 email explicitly terminating all his contractual relations with

HSM, constituted such a Termination Event.  (*See* Hazan Decl. ¶ 9; Tr. 7:9-9:24).

Hence, HSM is entitled to $1 million in liquidated damages under the plain

language of the Marketing Agreement.

That does not end the inquiry, however.  Under New York law, if a

contractual provision fixing liquidated damages "'is plainly or grossly

disproportionate to the probable loss, the provision calls for a penalty and will not

be enforced.'"  *Leeber Realty LLC v. Trustco Bank*, 316 F. Supp. 3d 594, 619

---

[4] As noted above, while both the Complaint and the initial motion for default judgment also sought reimbursement of attorney's fees (*see* Compl. ¶¶ 27-30; Pl. Br. at 15-16), HSM has opted not to seek such fees in the amended motion before the Court.  Counsel explains that this is due to the nature of his retainer agreement with HSM.  (Dkt. No. 36-2).

(S.D.N.Y. 2018) (quoting *Truck Rent–A–Ctr., Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 393 N.Y.S.2d 365, 361 N.E.2d 1015, 1018 (1977)). Even in the context of a default judgment, a court must assess whether the amount sought by the plaintiff constitutes a valid form of liquidated damages, on the one hand, or an unenforceable penalty on the other. *See LG Cap. Funding, LLC v. M Line Holdings, Inc.*, 422 F. Supp. 3d 739, 746 (E.D.N.Y. 2018) (rejecting plaintiff's argument that court should not address appropriateness of liquidated damages on default and explaining that "[t]he Court has an independent obligation to determine whether damages to be awarded are appropriate"); *Kingsbridge Med. Ctr., P.C. v. Hill*, 357 F. Supp. 2d 754, 758-59 (S.D.N.Y. 2005) (denying liquidated damages award against defaulting defendant as an unenforceable penalty).

"A party seeking to enforce a liquidated damages clause must meet two tests. First, at the time the contract was entered into, the anticipated damages in the event of a breach must be incapable of, or very difficult of, accurate estimation. Second, the amount of the damages specified in the liquidated damages clause must not be disproportionate to the damage reasonably anticipated for the breach as of the time the contract was made." *Brecher v. Laikin*, 430 F. Supp. 103, 106 (S.D.N.Y. 1977) (citations omitted); *see also Permanens Cap. L.P. v. Bruce*, No. 21 Civ. 10525 (JSR) (RWL), 2022 WL 3442270, at *13 (S.D.N.Y. July 22, 2022) ("Liquidated damages provisions are enforceable, under New York law, when (1) actual damages would be difficult to quantify, or are not readily ascertainable, and (2) the sum is a reasonable estimate of potential damages—in other words, the sum is not plainly

disproportionate to the possible loss[.]" (citation omitted)), *R&R adopted*, 2022 WL

4298731 (S.D.N.Y. Sept. 19, 2022).

### a. Ascertainability

In addressing the first prong of the analysis at the November 18 hearing,

HSM pointed to, *inter alia*, its future earnings from the Marketing Agreement as

difficult of reasonable estimation.  (Tr. 13:3:14:6).  Under the Commission Provision,

HSM was entitled to 20% of monies received by Beasley from Marketing Activities

over the four-year term of the Agreement.  (Marketing Agreement § 3).  The Court

agrees that such damages would be very difficult to estimate.  This is particularly so

given that (i) a professional athlete's earning capacity over a multi-year period is

subject to wide variation depending on performance, injuries, and other factors, and

(ii) Beasley terminated the Agreement early on, before any track record of his

revenues, and HSM's associated commission, had been built up.

Accordingly, this requirement of the test is satisfied.  *See, e.g., No Limit Auto

Enters., Inc. v. No Limit Auto Body, Inc.*, No. 21 Civ. 4755 (AMD) (JMW), 2022 WL

18399477, at *12 (E.D.N.Y. Dec. 12, 2022) (finding that expected losses "could not be

cleanly ascertained" when calculated based on, *inter alia*, commissions on "an

unknown amount—Defendant's future business revenues"), *R&R adopted*, 2023 WL

348271 (E.D.N.Y. Jan. 19, 2023); *HLT Existing Franchise Holding LLC v. Worcester

Hosp. Grp. LLC*, 994 F. Supp. 2d 520, 542 (S.D.N.Y. 2014) (holding that damages

based on royalties from gross revenue of a hotel were not "readily ascertainable,"

even when estimated on the basis of historical averages).

### b. Proportionality

HSM argues that the Liquidated Damages Amount is proportional to the damages reasonably anticipated to result from Beasley's breach. (Pl. Br. at 15). HSM provided Beasley a $650,000 Marketing Advance and expended an additional $193,774.64 on his behalf, bringing the total amount of funds advanced to $843,774.64. (Hazan Decl. ¶¶ 7-8). HSM decided to incur these expenditures in the belief that, given the prospective marketability of an NBA player of Beasley's stature, it would be able to earn commissions from Beasley's Marketing Activities exceeding $1 million over the four-year term of the Marketing Agreement. (*See* Pl. Br. at 15; Tr. 13:10-16).[5]

Given these circumstances, the Court easily concludes that the Liquidated Damages Amount is proportionate to the damages reasonably anticipated for the breach. *See In re Helios & Matheson Analytics, Inc.*, 633 B.R. 115, 121 (Bankr. S.D.N.Y. 2021) (finding that liquidated damages provision was not disproportionate where it "reasonably approximated the extent of [the non-breaching party's] revenue loss resulting from" a breach).

Accordingly, HSM has sufficiently established that the $1 million Liquidated Damages Amount in the Liquidated Damages Provision is not a penalty and is

---

[5] According to HSM, a player like Beasley should be able to earn $500,000 to $1 million per year in marketing and endorsement deals. (Pl. Br. at 15). Under the Marketing Advance Provision, HSM was entitled to 100% of Gross Earnings until it recouped the $650,000 Marketing Advance. (Marketing Agreement § 2). After that, it was entitled to 20% of Gross Earnings. (*Id.* § 3). If Beasley generated Gross Earnings at the mid-point of Beasley's estimate, *i.e.*, $750,000 per year for a total of $3 million over the four-year term, HSM would have received $1.12 million in commissions.

enforceable.  Moreover, HSM specifically sought recovery of this amount in its Complaint.  (Compl. ¶¶ 2, 13, 25–26 and p. 6).  The Court therefore recommends that HSM be awarded the Liquidated Damages Amount of $1 million based on Beasley's breach.

### 2.  Request for $193,774.64 in Expenses

HSM's path to recovery of its $193,774.64 in Expenses is not so clear.

As noted above, HSM seeks to recover its Expenses *as part of its liquidated damages*, on the theory that they should be added to the Liquidated Damages Amount pursuant to the Expenses Provision (Section 4).  (*See* Pl. Br. at 14; Hazan Decl. ¶ 17 ("HSM is seeking to recover liquidated damages in the amount of $1,193,774.64")).  That is for good reason.  Normally, a party would be able to recover such expenses as actual damages—more specifically, reliance damages— based on the other party's breach of contract.  *See Bausch & Lomb Inc. v. Bressler*, 977 F.2d 720, 729 (2d Cir. 1992) (under doctrine of reliance damages, "a plaintiff may recover his expenses of preparation and of part performance, as well as other foreseeable expenses incurred in reliance upon the contract" (citation omitted)).  But that is not a viable option for HSM in this case.

 The reason is that, under New York law "liquidated and actual damages are mutually exclusive remedies," and thus "a reasonable liquidated damages clause precludes any recovery of actual damages."  *U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, 369 F.3d 34, 71 (2d Cir. 2004) (cleaned up); *see also Wechsler v. Hunt Health Sys., Ltd.*, 330 F. Supp. 2d 383, 426 (S.D.N.Y. 2004) ("Ordinarily plaintiffs

are awarded either actual damages or liquidated damages, but not both when the
predicate for the awards is the same."). "The rationale for this rule is that
liquidated damages, by their nature, are in lieu of, not in addition to, other
compensatory damages." *Framan Mech., Inc. v. Dormitory Auth. of State of New
York*, 63 Misc. 3d 1218(A), 114 N.Y.S.3d 814 (table), 2019 WL 1747007, at *10 (Sup.
Ct. Albany Cnty. 2019) (cleaned up); *see also Fed. Realty Ltd. P'ship v. Choices
Women's Med. Ctr., Inc.*, 289 A.D.2d 439, 441, 735 N.Y.S.2d 159, 161 (2d Dep't 2001)
("Since the purpose of a liquidated damages clause is to prevent, in the event of a
breach, any question as to the amount of damages that may be recovered, a clause
which is reasonable precludes any recovery of actual damages."). Indeed, a
"contract provision for liquidated damages controls the rights of the parties in the
event of breach, notwithstanding that the stipulated sum may be less than the
actual damages allegedly sustained." *In re Ilana Realty, Inc.*, 154 B.R. 21, 27
(S.D.N.Y. 1993) (citation omitted).

As the Agreement contains a valid Liquidated Damages Provision, this
Provision controls the form of relief available to HSM. Hence, HSM cannot recover
both $1 million in liquidated damages and $193,774.64 in actual damages. HSM
can only recover the latter amount if it can be added to the Liquidated Damages
Amount.

The Agreement makes clear that HSM's expenses *can* be added to the
Liquidated Damages Amount. The Expenses Provision—Section 4 of the
Agreement—provides that "[a]ll expenses incurred by [HSM] toward the execution

of any Marketing Activity or in general service of, to, or on behalf of [Beasley] . . .
shall be recoverable by [HSM] if this Agreement is terminated for any reason
("Expenses")."  (Marketing Agreement § 4).  It goes on to provide that if the
Agreement is terminated before HSM is able to recoup the Marketing Advance and
its Expenses, "the Expenses incurred *shall be added to the Liquidated Damages
Amount*."  (*Id.*; emphasis added).[6]

Invoking Section 4 of the Agreement, HSM's brief in support of its motion for
default judgment states that "in accordance with [the Marketing Agreement's]
terms, Beasley is required to remit liquidated damages to HSM in the amount of
$1,000,000 *plus any additional expenses incurred by HSM in general service on
behalf of Beasley*."  (Mot. at 14; emphasis added).  The Court agrees: under Section 4
of the Agreement, HSM would be entitled to recover its Expenses as liquidated
damages.

Further, HSM has now adequately substantiated its Expenses.  That was not
the case based on HSM's initial motion for default, which simply requested a round
number of $250,000 in expenses without providing any explanation of how that
figure was calculated or supporting documentation.  (*See* Dkt. No. 25 ¶ 8).  After the
Court raised this issue during the November 18 hearing (*see* Tr. 22:13-23:7), HSM

---

[6] Additionally, the Termination Provision—Section 5 of the Agreement—similarly provides that, in
the event that HSM "has not fully recouped the Marketing Advance prior to the effective date of
Termination of this Agreement, [Beasley] shall be required to remit the Liquidated Damages
Amount as well as any Expenses incurred by [HSM] with respect to this Agreement to [HSM]"
within 30 days of the effective date of termination.  (Marketing Agreement § 5).  However, HSM does
not rely on or cite Section 5, either in the Complaint or in its motion papers.

amended its motion for default judgment specifically to address its failure to account for the expenses for which it seeks relief. To that end, HSM submitted an amended declaration from Hazan revising its expenses claim down to $193,774.64 and attaching a table detailing the date, subject, amount, and method of payment of each expenditure. (*See* Hazan Decl. ¶¶ 13, 15 & Ex. B).

Nevertheless, HSM's claim for its Expenses encounters an insuperable obstacle: HSM failed to include this claim in its Complaint, and it is now precluded from obtaining such relief under Rule 54(c) of the Federal Rules of Civil Procedure.

Rule 54(c) states: "A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." Fed. R. Civ. P. 54(c). "[C]ourts have refused to grant any relief on default judgment that was not specifically alleged or requested in the operative pleading." *Lamaka v. Russian Desserts Inc.*, No. 18 Civ. 7354 (ILG) (VMS), 2021 WL 2188280, at *6 (E.D.N.Y. Feb. 12, 2021) (collecting cases), *R&R adopted*, 2021 WL 2184870 (E.D.N.Y. May 28, 2021). "[A] default judgment may not extend to matters outside the issues raised by the pleadings or beyond the scope of the relief demanded." *Danial v. Langenbach*, No. 12 Civ. 2983 (VB), 2014 WL 5169389, at *13 (S.D.N.Y. Oct. 14, 2014) (citation omitted). "[M]eaningful notice [is] called for by Rule 54(c), which anticipates that defendants will look to the demand clause to understand their exposure in the event of default." *Silge v. Merz*, 510 F.3d 157, 160 (2d Cir. 2007); *see Lamaka*, 2021 WL 2188280, at *6 ("The theory behind this rule is that 'the defending party should be able to decide on the basis of the relief requested in the original pleading whether to

expend the time, effort, and money necessary to defend the action.'" (quoting 10
Charles Alan Wright et al., *Federal Prac. & Proc.* § 2663 (4th ed. 2014)).

Here, the Second Claim for Relief in HSM's Complaint—the claim seeking
liquidated damages—cites only Section 2 of the Agreement (the Liquidated
Damages Provision) and asserts that, pursuant to that Provision, "HSM is entitled
to recover liquidated damages in the sum of $1,000,000 with statutory interest
running from thirty (30) days from the date the Marketing Agreement is deemed to
have terminated *together with any 'Marketing Fees'* (as defined in the Marketing
Agreement) earned and unpaid as of that same date."  (Compl. ¶¶ 25-26; emphasis
added).[7]  HSM's claim does *not* cite or refer to Section 4 of the Agreement (the
Expenses Provision), which is the basis for HSM's argument in its motion for
default judgment for why its expenses are recoverable as liquidated damages.  Nor
does the Second Claim for Relief refer to HSM's expenses or seek recovery of such
expenses in addition to the $1 million liquidated damages sum.

The same is true of the Complaint's *ad damnum* clause.  With respect to
HSM's claim for liquidated damages, the *ad damnum* clause demands: "Upon the
Second[] Claim for Relief, in the alternative, a money judgment awarding liquidated
damages in the sum of $1,000,000 with statutory interest running from thirty (30)
days from the date the Marketing Agreement is deemed to have terminated *together
with any Marketing Fees* earned and unpaid as of that same date."  (Compl. at 6;

---

[7] Paragraph 25, although quoting the relevant language of Section 2 of the Agreement, mistakenly
refers to it as "Section 1 (a) of the Marketing Agreement."

emphasis added).  Thus, like the Second Claim for Relief itself, the *ad damnum* clause does not demand recovery of HSM's expenses in addition to the $1 million liquidated damages sum; the only additional amounts it seeks are for statutory interest and "Marketing Fees."

Thus, the Complaint only put Beasley on notice that HSM was seeking to recover, as liquidated damages, $1 million plus marketing fees (as well as statutory interest).  If the term "Marketing Fees" could reasonably be construed to refer to or encompass HSM's expenses, that might salvage HSM's claim.  But it cannot.

"Marketing Fees" as described in the Complaint is plainly a reference to Section 2, which requires Beasley to pay, in the case of a Termination Event, "liquidated damages in the amount of $1,000,000 . . . along with any marketing fees due and payable under this Agreement[.]"  (Marketing Agreement § 2).  Although "marketing fees" is not defined in the Agreement,[8] it is most reasonably understood to refer to commissions earned by HSM as a result of Beasley's Marketing Activities.  The Complaint's Second Claim for Relief and *ad damnum* clause assume as much, referring to Marketing Fees "earned and unpaid as of" Beasley's termination.  (Compl. ¶ 26 & p. 6).  It makes sense to describe commissions as "earned," and indeed Section 2 of the Agreement does so, referring to HSM's entitlement "to earn Commission as set forth in Section 3 of this Agreement."

---

[8] Despite the Complaint's reference to "'Marketing Fees' (as defined in the Marketing Agreement)" (Compl. ¶ 26), no definition of "marketing fees" appears in the Agreement.  The phrase "marketing fees" does not appear as a capitalized term and appears only once in the Agreement (in Section 2).

Conversely, it would make no sense to describe HSM's expenses, incurred on behalf of Beasley pursuant to Section 4, as "earned."

In relying only on Section 2 and not Section 4 in its liquidated damages claim and related *ad damnum* clause, the Complaint did not provide meaningful notice to Beasley that HSM was seeking to recover its expenses as liquidated damages. Assuming that Beasley reviewed the Complaint with an eye towards ascertaining what judgment would be rendered against him if he elected to default (as Rule 54(c) requires the Court to assume, *see Silge*, 510 F.3d at 160), he would have seen and understood that HSM was demanding, as liquidated damages, $1 million plus commissions earned by HSM as of the date of termination—not $1 million plus expenses paid by HSM.[9]

Under Rule 54(c), this lack of notice is fatal to HSM's request to include the requested $193,774.64 in Expenses as part of the default judgment.[10]  *See Marina B*

---

[9] The Complaint does contain one fleeting reference to HSM's expenses, in Paragraph 4, which alleges that the Marketing Agreement "contains a liquidated damages clause in favor of HSM in the amount of $1,000,000 . . . plus any applicable commissions owed or expenses advanced on behalf of Beasley during the course of HSM's representation of Beasley." (Compl. ¶ 4). But Rule 54(c) limits a judgment by default to "what is demanded in the pleadings," Fed. R. Civ. P. 54(c), and HSM's Complaint makes no demand for recovery of its expenses in its liquidated damages claim, in its *ad damnum* clause for that claim, or otherwise. The lone reference to "expenses" in Paragraph 4 was clearly insufficient to provide Beasley with "meaningful notice" of HSM's demand for expenses, *see Silge*, 510 F.3d at 160, and does not satisfy the dictates of Rule 54(c). *See, e.g., Master Grp. Glob. Co. v. Toner.Com Inc.*, No. 19 Civ. 6648 (AMD) (RLM), 2020 WL 5260581, at *12 (E.D.N.Y. Aug. 10, 2020) (declining to find that defaulting defendant had sufficient notice of plaintiff's intent to recover pre-judgment interest where, despite other allegations in complaint requesting "interest," the complaint's *ad damnum* clause and relevant cause of action omitted any reference to pre-judgment interest), *R&R adopted*, 2020 WL 5259057 (E.D.N.Y. Sept. 3, 2020).

[10] At the November 18 hearing, the Court raised this precise concern with HSM's counsel. (Tr. 21:16-19 ("I am having a little bit of a hard time seeing my way clear to approving the damages claim for expenses in light of [Rule 54(c)] and case law.")).  Counsel acknowledged that this was "a point well taken," noted that HSM "could've filed an amended complaint to reflect that," and said that if HSM did not get a default judgment covering the expenses, "we could live with that ultimately." (*Id.*

*Creation S.A. v. de Maurier*, 685 F. Supp. 910, 912-13 (S.D.N.Y. 1988) (refusing to increase plaintiff's damages for patent infringement where complaint made no demand for treble damages); *Am. Jewish Comm. v. Berman*, No. 15 Civ. 5983 (LAK) (JLC), 2016 WL 3365313, at *10 (S.D.N.Y. June 15, 2016) (denying request for "commission fees" on motion for default judgment "because such damages are different in kind from those pled in the complaint"), *R&R adopted*, 2016 WL 4532201 (S.D.N.Y. Aug. 29, 2016).

Accordingly, the Court recommends that HSM be awarded a total of $1,000,000 in damages.

### 3. Pre-Judgment Interest

With respect to pre-judgment interest, a court sitting in diversity applies the forum state's substantive law. *Schipani v. McLeod*, 541 F.3d 158, 164-65 (2d Cir. 2008). As discussed, New York substantive law applies to Plaintiff's claims, and New York law provides that "a plaintiff who prevails on a claim for breach of contract is entitled to prejudgment interest as a matter of right." *U.S. Naval Inst. v. Charter Comm'ns, Inc.*, 936 F.2d 692, 698 (2d Cir. 1991) (citing N.Y. C.P.L.R. § 5001). Under subsection (a) of Section 5001, pre-judgment interest "*shall be recovered* upon a sum awarded because of a breach of performance of a contract." N.Y. C.P.L.R. § 5001(a) (emphasis added); *see also Katzman v. Helen of Troy Tex.*

---

21:23-22-11). The Court invited HSM to make a submission on the issue after the hearing. (*Id.* at 21:19-22; *see also id.* 27:23-25). But although HSM submitted documentation and an amended declaration from Hazan substantiating that it incurred the expenses, it did not submit any legal argument explaining how the Court could award those expenses in light of Rule 54(c).

*Corp.*, 12 Civ. 4220 (PAE), 2013 WL 1496952, at *2, (S.D.N.Y. Apr. 11, 2013) ("A long line of case law has held that prejudgment interest [under Sections 5001(a) and 5004] is mandatory."). New York law further specifies a nine percent interest rate per annum. N.Y. C.P.L.R. § 5004.

The Complaint demands "statutory interest running from thirty (30) days from the date the Marketing Agreement is deemed to have terminated." (Compl. at 6). Beasley terminated the Agreement on February 25, 2025 (Hazan Decl. ¶ 9), and 30 days after that date is March 27, 2025. Thus, the Court recommends awarding HSM pre-judgment interest at the rate of 9% from March 27, 2025 until the date that judgment is entered. This equates to $246.58 per day.

### 4. Post-Judgment Interest

Finally, post-judgment interest is governed by federal statute and is "mandatory." *Jacobs v. del la Maza*, No. 20 Civ. 3320 (ARR) (TAM), 2023 WL 5680180, at *13 (E.D.N.Y. Aug. 18, 2023) (citing 28 U.S.C. § 1961(a)); *see also Schipani v. McLeod*, 541 F.3d 158, 164-65 (2d Cir. 2008) (noting that, in contrast to prejudgment interest, "postjudgment interest is governed by federal statute" in a diversity case, and that "we have consistently held that an award of postjudgment interest is mandatory") (citations omitted). Accordingly, once entered, the judgment will bear post-judgment interest at the federal statutory rate pursuant to 28 U.S.C. § 1961(a).

## CONCLUSION

For the foregoing reasons, the undersigned recommends that: (1) Defendant Malik Beasley be found liable for breach of contract and (2) that Plaintiff Hazan Sports Management Group, Inc. be awarded damages of $1,000,000, plus pre-judgment and post-judgment interest.  Plaintiff shall promptly serve Defendant with a copy of this Report and Recommendation and file proof of such service on the docket no later than February 4, 2026.

DATED:    New York, New York
          January 31, 2026

          _____
          GARY STEIN
          United States Magistrate Judge

## NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. Section 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen days, inclusive of weekends and holidays, from the date of service of this Report and Recommendation to file written objections thereto.  *See also* Fed. R. Civ. 6(a), (b), and (d).  Any such objections shall be filed with the Clerk of Court.  Any request for an extension of time to file objections must be directed to the Honorable Jeannette A. Vargas.  A failure to file timely objections will preclude appellate review.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Wagner v. Wagner, LLP*

*v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010).